896 F.Supp. 362 (1995)
UTI CORPORATION, Plaintiff,
v.
FIREMAN'S FUND INSURANCE COMPANY and American Insurance Company, Defendants.
Civ. A. No. 92-4703 (JBS).
United States District Court, D. New Jersey.
March 28, 1995.
*363 *364 *365 Neil S. Witkes, Jonathan E. Rinde, Manko, Gold & Katcher, Bala Cynwyd, PA, for plaintiff.
Julius F. Harms, Caron, Greenberg & Fitzgerald, Rutherford, NJ, for defendants.
SIMANDLE, District Judge:
Presently before the court are the motions, numbered 1, 2 and 3, of defendants for summary judgment and the cross-motion of plaintiff for summary judgment in this insurance coverage dispute between defendants, Fireman's Fund Insurance Company and American Insurance Company, and their insured, plaintiff UTI Corporation, in connection with certain actions brought against plaintiff for pollution.
The pollution claims which underlie the instant coverage dispute can be briefly described as follows. Plaintiff UTI, which is the successor corporation to Uniform Tubes, Inc. (hereinafter collectively referred to as "UTI"), manufactures "precision, small diameter tubing," with its principal place of business located in Collegeville, Pennsylvania. Pl. 12G Statement at ¶ 2. As part of its manufacturing operations, UTI uses solvents, which, through 1977, were stored in three underground storage tanks ("USTs") located under UTI's Plant No. 1. From 1964 to July 1975, UTI stored trichloroethylene ("TCE") in the USTs. In July, 1975, UTI switched from TCE to 1,1,1 trichloroethane ("TCA"), which it stored in the USTs.
In July, 1977, during an inspection of UTI's facility, Donald Knorr of the Pennsylvania Department of Environmental Resources *366 ("PaDER"), observed a bluish discharge from a pipe into a swale. The discharge was traced back to a broken pipe underneath the floor of UTI's pickle house. UTI took action to correct the problem. In September, 1977, Mr. Knorr returned to UTI's facility, having obtained the results of a water sample taken from a neighbor's well during the July inspection. The results of the water sample showed the presence of TCE and TCA in the neighbor's well water. The suspected source of the leak was UTI's USTs.
UTI engaged an expert, one Roy F. Weston, who concluded that the source of the groundwater contamination was a TCE/TCA leak from the USTs. After a letter was sent to Alexander & Alexander ("A & A"), UTI's insurance broker, apprising defendants of the groundwater contamination and the possibility of claims, Fireman's Fund advised plaintiff, on November 30, 1978, that it was denying coverage. Thereafter, on December 18, 1978, UTI commenced an action in the United States District Court for the Eastern District of Pennsylvania against Fireman's Fund and Home Insurance Company, seeking coverage under one of the Fireman's Fund policies for coverage connected with the groundwater contamination. That matter was settled pursuant to a Settlement and Release Agreement dated June 16, 1982.
On April 22, 1981, the Collegeville-Trappe Joint Water System, a neighboring public water authority ("water authority"), sued UTI in the Court of Common Pleas in Montgomery County, Pennsylvania for contaminating groundwater as a result of a TCE leak. The complaint in the water authority action referred to a TCE leak from UTI's USTs in May, 1979 "and for some period prior thereto," which contaminated the groundwater supply. Coverage was denied for that claim by letter dated May 14, 1981 from Fireman's Fund. Home Insurance Company undertook the defense of UTI in the water authority action. During the latter part of 1991, settlement discussions between UTI and the water authority intensified; apparently the action had lied relatively dormant for some length of time. It became clear, according to UTI, that the water authority action could not be settled by UTI within the asserted $500,000 limits of the Home policy. After sending a letter to Fireman's Fund requesting that the insurer acknowledge coverage to UTI for the claims asserted in that action in excess of Home's $500,000 limit, UTI was advised by Fireman's Fund to "take appropriate steps to protect" its interests, Pl. 12G Statement at ¶ 34, and UTI settled the water authority action by agreement dated July 2, 1992 for $900,000, $500,000 of which was paid by Home. UTI tendered the remaining $400,000 to settle the case.
In 1978 the Collegeville site was treated with a "pump and treat" system to extract TCE and TCA from the groundwater under the facility. UTI operated the groundwater remediation system under PaDER's authority. Id. at ¶ 38. In the 1980s, the United States Environmental Protection Agency ("EPA") asserted jurisdiction over the remediation activities, and asserted claims against UTI under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 9601 et seq. Id. at ¶ 39. Two administrative consent orders were negotiated. The first, dated July 6, 1988, required UTI, inter alia, to complete its ongoing hydrogeologic evaluation and propose remedial alternatives. Id. at ¶ 41. The second administrative consent order, signed March 31, 1992, required UTI, inter alia, to implement selected groundwater treatment remedies. Id. at ¶ 42. UTI seeks reimbursement from Fireman's Fund for costs incurred to perform the groundwater cleanup under EPA's jurisdiction.
The policies issued by Fireman's Fund, or its wholly-owned subsidiary, American Insurance Company, to UTI at issue in the instant case are as follows:

 CGL Coverage[1]
Term Policy Number
4/7/64-4/7/67 TP-24112
4/7/67-4/7/70 MXP-1435805
4/7/70-5/7/73 MXP-1550776
5/7/73-5/7/76 MXP-2412312
5/7/76-2/14/77 MXP-3008464

*367
 Excess Coverage
Term Policy Number
6/7/69-6/7/72 XL-33943
6/7/72-6/7/73 XLB-1065316*[2]
6/7/73-4/7/74 XLB-1069383*
6/7/74-6/7/75 XLB-1071748
6/7/75-5/7/76 XLB-1242425
5/7/76-5/7/77 XLB-1244947
5/6/77-5/6/78 XLX-1267851
5/6/78-5/6/79 XLX-1268771

Against this factual backdrop, I proceed to treat each of the arguments advanced in defendants' motions, and plaintiff's cross-motion, for summary judgment in turn. The motions, which are voluminous[3], raise multiple issues, most of which involve disputed factual questions of a type which cannot be resolved on a motion for summary judgment.

Discussion

A. Summary Judgment Standards

The court's jurisdiction is based upon diversity of citizenship under 28 U.S.C. § 1332(a).
The summary judgment movant must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). See Hersh v. Allen Products. Co., Inc., 789 F.2d 230, 232 (3d Cir.1986); Lang v. New York Life Ins. Co., 721 F.2d 118, 119 (3d Cir.1983). In deciding whether there is a disputed issue of material fact the court must view all inferences, doubts and issues of credibility in favor of the non-moving party. See Hancock Industries v. Schaeffer, 811 F.2d 225, 231 (3d Cir. 1987) (citation omitted); Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n. 2 (3d Cir.1983), cert. denied, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).
Supreme Court decisions mandate that "a motion for summary judgment must be granted unless the party opposing the motion can produce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." J.E. Mamiye & Sons, Inc. v. Fidelity Bank, 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring) (citing Anderson, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202, and Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Moreover, once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. Anderson, 477 U.S. at 249, 106 S.Ct. at 2510-11. Nonetheless, defendants, as the moving party on the motion, and plaintiff, as the moving party on the cross-motion, bear, respectively, the initial responsibility of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 325, 106 S.Ct. at 2553-54.

B. Defendants' Motion for Summary Judgment on Statute of Limitations Grounds

Defendants move for summary judgment on the ground that the statute of limitations bars plaintiff's claims. It is defendants' position that Counts II, IV and V of plaintiff's complaint (counts regarding breach of contract in connection with the water authority action, declaratory judgment, and bad faith conduct of the insurance company) are untimely because the underlying causes of action accrued more than four years before November 2, 1992, the date plaintiff commenced the instant action.
Defendants are correct that the applicable statute of limitations for contract actions *368 under Pennsylvania law is four years.[4] 42 Pa.C.S.A. § 5525(8). They are incorrect, however, to argue that the statute had long run by the time the instant action was filed based upon the facts that (1) A. Brooke Aker, as counsel for UTI, tendered the water authority action complaint by letter dated April 30, 1981, and (2) coverage was denied by Mary Butter's letter, on behalf of Fireman's Fund, dated May 14, 1981. The problem with defendant's reasoning is that the May 14, 1981 denial of coverage letter does not trigger the running of the statute in this coverage action.
Rather, under Pennsylvania law, the statute of limitations does not begin to run against an insurer until the conclusion of the litigation against the insured by the injured party. Prior to that time, the defense and indemnity expenses incurred for which the insurer sues are not determined. As the court recognized in Moffat v. Metropolitan Cas. Ins. Co. of New York, 238 F.Supp. 165, 175 (M.D.Pa.1964), in rejecting the insurer's argument that the statute began to run on the date of its disclaimer of coverage:
The result contended for by Metropolitan is absurd. In this day of crowded court calendars and delays of years before trial, an insured could find that the statute had run long before he had incurred his trial and appellate expenses. Also it would lead to a multiplicity of suits, long in disfavor in law. There would be a suit for costs and expenses and then, after judgment against the insured, a suit for indemnity. The latter cannot be started until there is a final judgment against the insured.
Id. at 175.
Accordingly, the denial of coverage letter in 1981 did not activate the statute of limitations for purposes of the coverage action. The water authority action was a case which was not timely called for trial, and settlement of the action did not occur until July 2, 1992, on the eve of trial. Prior to that time, plaintiff could not have known that the limits of the Home policy would be exceeded and that it would need to pay $400,000 out of pocket to consummate settlement on the action. Accordingly, as Moffat recognized, it could only have been inefficient for plaintiff to have sued for coverage prior to that time, when there was a possibility that the action would be disposed of for less than the limits of the Home policy. We hold that, with regard to the water authority claim, the instant cause of action accrued on July 2, 1992, and the instant action, commenced within five months of that date, was timely.
As to the "bad faith" claim contained in Count V of plaintiff's complaint, that cause of action did not earlier accrue. As plaintiff points out, an insurer has a continuing obligation to act in good faith towards its insured, which obligation extends through litigation. See Kauffman v. Aetna Cas. & Sur. Co., 794 F.Supp. 137, 140 (E.D.Pa.1992); Rottmund v. Continental Assurance Co., 813 F.Supp. 1104, 1109-11 (E.D.Pa.1992). The bad faith actions alleged in the complaint include "refusing to participate in the defense of UTI or to indemnify UTI for damages for the reason that it has not received sufficient information to render a coverage opinion, while failing to undertake its own independent investigation to obtain information from other sources to assemble what it believes to be complete information necessary to render a coverage opinion." Cmplt., Count V, ¶ 38(f). In this connection, the court notes that it was by letter dated April 1, 1992, that Michelle Musante of Fireman's Fund stated, in response to the second round of correspondence from UTI on the water authority claim (informing Fireman's Fund of the possibility of settlement for more than $500,000), that she had not completed her investigation, and advised UTI to take appropriate steps to protect its interests. Any bad faith claim related to such conduct by Fireman's Fund could not be time-barred, as the complaint was filed within months of that event.[5] Like the other counts of plaintiff's *369 complaint, Count V will not be dismissed on statute of limitations grounds.
For the sake of completeness, even if the law were unclear, the court would be constrained to reject defendants' argument for a wholly distinct reason  the language of the policies themselves requires plaintiff to await a final judgment before suing on the policies. Plaintiff points out, Br. at 102, that each of the Fireman's Fund policies contains language similar or identical to the following: "No action shall lie against the [insurance] company unless, as a condition precedent thereto, ... the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company." Whatever the legal effect of this language is in light of the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, the defendants should not be permitted to argue, at least with regard to the breach of contract claim, that the statute of limitations began running at any earlier time. For all these reasons, defendants' motion for summary judgment on statute of limitations grounds will be denied. Plaintiff's cross-motion for summary judgment on the statute of limitations issue will be granted, the court finding all counts to have been timely filed.

C. Defendants' Argument for Summary Judgment on the Ground that the Instant Action is Barred by Laches

The equitable defense of laches is available where there is a failure to assert one's rights in a timely and diligent manner, resulting in prejudice to the opposing party. Wheeler v. Nationwide Mut. Ins. Co., 749 F.Supp. 660, 662 (E.D.Pa.1990) (Pa. law) (citing Western Water Co. v. Board of Prop. Assessment, 124 Pa.Commw.Ct. 133, 555 A.2d 1357 (1989)). The burden of establishing laches falls upon the defendant if the statute of limitations concerning the action has not yet expired. Id. (citing Gall v. U.S. Steel Corp., 598 F.Supp. 769, 773 (W.D.Pa. 1984)). Because defendants premised their initial argument on the concept that the statute of limitations had run, they theorized, wrongly, that plaintiff bore the burden of coming forward with evidence to disprove laches. Def.Br. at 20-21. Here, however, the burden is on defendants, and the court finds that defendants have failed to meet their burden with regard to each of the two prongs  namely, to show that plaintiff failed to pursue its claim in a timely and diligent manner, and to show that defendants suffered prejudice.
In its reply brief, defendant attempts to make the requisite showings. Suffice it to say that defendant fails to meet its burden. For example, the fact that Fireman's Fund made the unilateral decision to close its claim file some time after the execution of the Settlement and Release Agreement with its insured on June 16, 1982 is of no moment for a laches analysis. Cf. Wheeler, 749 F.Supp. at 662-663 (insurer's decision to purge claim file within three years after accident does not evidence prejudice). The court similarly rejects defendants' argument that it should find prejudice to the insurer where a claim denial was tendered by Fireman's Fund in May, 1981 on the water authority claim, and where "nothing more was heard" from UTI until February, 1992, when UTI sought reconsideration of the denial in light of recent events. Fireman's Fund had already articulated its position, and the case law does not support the proposition that there are additional burdens placed upon an insured in order to protect its rights against its insurer once coverage has been denied. Accordingly, defendants' motion for summary *370 judgment on the basis of laches will be denied. Plaintiff's cross-motion for a declaration that laches does not bar the action will be granted, as defendants have failed to present proof which, consistent with their burden of proof at trial, could be the basis for a jury finding in its favor on the defense.

D. Defendants' Argument that the Pollution Exclusion Bars Coverage

Defendants move for summary judgment, seeking a declaration that, as a matter of law, certain of the policies containing a pollution exclusion do not provide coverage for the gradual pollution at issue here. Plaintiff cross-moves for summary judgment on the ground that defendants are estopped from arguing that the "pollution exclusion" clause found in any of defendants' policies limits coverage to pollution incidents that are of short duration, and seeks to strike defendants' affirmative defenses based upon the pollution exclusion. The parties have stipulated that Pennsylvania law applies, in a Consent Order filed February 19, 1993.[6]
The policies at issue contain the following language:
This insurance does not apply:
(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials, or other irritants, contaminants or pollutants into or upon the land, the atmosphere or other water course or body of water; but this exclusion does not apply if such discharge, dispersal, escape or release is sudden and accidental.
See Def.Br. at 25.
The basic underlying facts are uncontested, and the seepage of pollutants, including TCE, from UTI's USTs, took place over an extended period of time. Thus, defendants press that governing Pennsylvania law provides that no coverage is available under the policies containing the exclusionary language.[7]
Although the Pennsylvania Supreme Court has not yet ruled on the issue, the Superior Courts of Pennsylvania have found the pollution exclusion to be a bar to coverage under similar circumstances. Finding the language clear and unambiguous, the court in O'Brien Energy Systems, Inc. v. American Employers' Ins. Co., 427 Pa.Super. 456, 466, 629 A.2d 957, 962 (1993), affirmed the trial court's entry of summary judgment in favor of the insurers on the ground that the pollution exclusion barred the insured from obtaining coverage for property damage caused by the gradual migration of methane gas: "It must be said in this case ... that the policy language in the several policies contains an unambiguous, all-encompassing disclaimer of coverage for damages caused by a migration of polluting gases." Relying in part upon an earlier decision of the Superior Court in Techalloy Co., Inc. v. Reliance Ins. Co., 338 Pa.Super. 1, 12-14, 487 A.2d 820, 826-27 (1984), allocatur denied, 338 E.D.Allo.Dkt. 1985 (Pa. Oct. 31, 1985), where the court held that there could be no coverage for a chemical discharge in the face of a pollution exclusion unless the discharge at issue was both *371 sudden, "meaning abrupt and lasting only a short time," and accidental, "meaning unexpected." O'Brien, 427 Pa.Super. at 466, 629 A.2d at 962, and also relying on Lower Paxon Twp. v. United States Fidelity and Guar. Co., 383 Pa.Super. 558, 569, 557 A.2d 393, 398 (1989), which held the exclusion unambiguous, the O'Brien court rejected the insured's argument that coverage should not be barred on the ground that the insured was not an "active polluter," but rather was merely alleged by third parties to have been negligent in the maintenance of its gas to energy facility.
Plaintiff does not argue that the interpretation of the pollution exclusion set forth in O'Brien, Techalloy, and Lower Paxon should be rejected by this court. Rather, plaintiff argues that, however persuasive the authority is upon which defendants rely in support of their argument that the pollution exclusion bars coverage for claims arising out of gradual pollution of the environment, defendants should be estopped from so arguing in this particular case. Plaintiff urges this conclusion based upon (1) representations made to it directly by defendants or their representatives (the brokers of the policies) regarding the meaning of the pollution exclusion; (2) representations made by defendants, through their industry representatives (e.g., the Insurance Services Organization ("ISO")), to state regulatory agencies regarding the meaning of the pollution exclusion when presenting for state approval the new standard insurance forms containing the pollution exclusion; and (3) representations made by the defendant to its own claims people and brokers about the meaning of the pollution exclusion.
"Pennsylvania insurance law incorporates principles of equitable estoppel." West American Ins. Co. v. Park, 933 F.2d 1236, 1239 (3d Cir.1991):
"Reduced to its essence, equitable estoppel is a doctrine of fundamental fairness intended to preclude a party from depriving another of a reasonable expectation, when the party inducing the expectation knew or should have known that the other would rely to his detriment upon that conduct."
(Quoting Straup v. Times Herald, 283 Pa.Super. 58, 423 A.2d 713 (1980)). Thus,
"[t]he reasonable expectation of the insured is the focal point of the insurance transaction.... Courts should be concerned with assuring that the insurance public's reasonable expectations are fulfilled. Thus, regardless of the ambiguity, or lack thereof, inherent in a given set of insurance documents ... the public has a right to expect that they will receive something of value in return for the premium paid."
Id. (quoting Collister v. Nationwide Life Ins. Co., 479 Pa. 579, 388 A.2d 1346 (1978), cert. denied, 439 U.S. 1089, 99 S.Ct. 871, 59 L.Ed.2d 55 (1979)).
In applying Pennsylvania law, the Third Circuit made clear in Park that the plaintiffs may attempt to defeat the otherwise plain meaning of a clause in an insurance contract if they reasonably expected the contract to provide coverage in a particular situation:

Collister and subsequent insurance cases expand traditional notions of equitable estoppel so that the insurer is bound not only by the expectations that it creates, but also by any other reasonable expectations of the insured. The insured's reasonable expectations control, even if they are contrary to the explicit terms of the policy. State Farm Mut. Auto Ins. Co. v. Williams, 481 Pa. 130, 392 A.2d 281 (1978).
Id. (emphasis supplied).
Here, plaintiff has come forward with sufficient evidence to support its position that it reasonably expected the policies containing the "sudden and accidental" pollution exclusion to provide coverage for gradual pollution claims and to defeat defendants' motion for summary judgment. Indeed, plaintiff has done more than what Park would seem to require of them by producing evidence to support an argument under even the most traditional notions of equitable estoppel  plaintiff produces evidence of actual representations made to it by representatives of defendant (the insurance broker) to the effect that the pollution exclusion would do nothing other than to clarify the coverage previously afforded by policies which did not contain such an exclusion. Specifically, plaintiff produces the Declaration of John J. *372 Sherman, Jr., who, while employed by Alexander & Alexander, managed the UTI account. Ex. 56 ¶ 1. Mr. Sherman states: "From discussions with representatives of Fireman's Fund, I understood this exclusion [the pollution exclusion] to have the same meaning as in the [standard] 1973 CGL form,[8] that is, to provide coverage for pollution damage as long as the event or events giving rise to the damage was neither expected nor intended by the insured." Id. ¶ 6. He goes on to explain:
Consistent with the representations made by the insurance industry, including Fireman's Fund, during my annual review, I advised UTI that the Fireman's Fund 1973 CGL form continued to provide pollution coverage like the 1966 CGL form. Likewise, I advised UTI during my annual review that the Fireman's Fund excess liability policy continued to provide pollution coverage.
Id. ¶ 8.
With the Sherman Declaration, plaintiff has produced evidence that it was advised that the policies it purchased from defendants containing the pollution exclusion did not alter the coverage previously provided. As Cornelius Verhoog, current Vice President, Finance of UTI and the individual who has, since 1972, overseen UTI's insurance needs, states in his Declaration, it was not until some time in the 1980s, after the introduction of the so-called "absolute" pollution exclusion[9], that he was first advised of a pollution exclusion which eliminated pollution coverage for his company. Verhoog Dec., Ex. 55, at ¶ 8. Pennsylvania law clearly provides that plaintiff must be permitted to pursue this theory at trial, namely, to show that its expectations of coverage for gradual, unintentional and unexpected pollution were reasonable, based, among other things, upon representations made to it by its insurance brokers (who acted upon information provided by defendants).[10] In the present instance, there is evidence that Sherman's agency, Alexander & Alexander, was Fireman's Fund's agent (Ex. 97), upon whose statements plaintiff's Verhoog could reasonably base an expectation of coverage.
Standard Venetian Blind Co. v. American Empire Ins. Co., 503 Pa. 300, 469 A.2d 563 (1983), urged as controlling by defendants, is not to the contrary. In that case, the Pennsylvania Supreme Court was confronted with a situation in which a clear and unambiguous exclusion governed the claim presented, but in which the insured argued that the exclusion should be stricken on the ground that he had failed to read the policy, and that the insurer had not taken affirmative steps to explain the exclusion to him. The Court ordered the entry of judgment in favor of the defendant, but its holding was limited:
We hold only that where, as here, the policy limitation relied upon by the insurer to deny coverage is clearly worded and conspicuously displayed, the insured may not avoid the consequences of that limitation by proof that he failed to read the limitation or that he did not understand it.
Id. at 307, 469 A.2d 563, 567. See also Tonkovic v. State Farm Mut. Automobile Ins. Co., 513 Pa. 445, 521 A.2d 920 (1987) (Venetian Blind's holding not to be mechanically applied regardless of the factual context in which the claim arose).
Unlike Standard Venetian Blind this is not a case in which plaintiff's argument is premised upon a failure to read. Standard Venetian Blind has nothing to say about the availability of an estoppel defense under circumstances where an otherwise clear and unambiguous exclusion was misrepresented to the insured, causing the insured to reasonably *373 believe its policy provided coverage notwithstanding the exclusionary language. Indeed, Park was decided by the Third Circuit long after the Pennsylvania Supreme Court decided Standard Venetian Blind, and Park nonetheless strongly reinforced the proposition that Pennsylvania courts expand traditional estoppel notions in insurance coverage cases in order to protect the reasonable expectations of the insured.
The continuing availability of a reasonable expectation analysis after Standard Venetian Blind, even under circumstances where the exclusionary language is otherwise clear and unambiguous, was also articulated by the Pennsylvania Superior Court in Dibble v. Security of America Life Ins. Co., 404 Pa.Super. 205, 590 A.2d 352 (1991). In that case, the insurer argued that coverage under a life insurance policy was clearly unavailable for the suicide of plaintiff's spouse, where the policy required that suicide would only be covered if such an event occurred more than two years from the effective date of the policy; the application for the policy was completed on July 11, 1986, a premium was paid on August 11, 1986, the application provided that the insurance would become effective on the first of the second month following approval if the application were approved after the 20th day of the month, the application was formally approved on September 8, 1986, and plaintiff's spouse committed suicide on September 28, 1988. The court affirmed the trial court's grant of summary judgment in favor of the insured, although it did not disagree with the insurer that the applicable policy language was unambiguous:
In the instant situation, the Dibbles could have reasonably believed that when they paid the first premium on August 11, 1986, that the mortgage life insurance policy became effective at that time. By simply directing us to unambiguous language in the application and policy, Security of America has not established by clear and convincing evidence that the Dibbles were unreasonable in believing that coverage began upon their payment of the first premium.
Id. at 212, 590 A.2d 352, 353.
For all these reasons, the court rejects defendants' argument that Standard Venetian Blind is controlling. Plaintiffs' estoppel argument, supported by evidence on the instant cross-motions, retains validity under controlling Pennsylvania law.
In sum, plaintiff has met its burden to show the existence of genuine issues of material fact remaining for trial on the issue of whether the pollution exclusion may be applied to bar coverage for claims arising out of gradual pollution from the USTs. As to plaintiff's cross-motion for summary judgment on the ground that defendants are estopped from arguing that the "pollution exclusion" clause found in any of defendants' policies limits coverage to pollution incidents that are of short duration, that motion must also be denied because genuine issues of material fact remain for trial. Plaintiff will, however, be permitted to present its estoppel defense at trial for resolution by the finder of fact.

E. Defendants' Argument that All or Parts of UTI's "Damages" Are Barred By the June 16, 1982 Settlement and Release Agreement

In June, 1982, the parties to the instant action executed a Settlement and Release Agreement to dispose of the claims stated against defendant Fireman's Fund by UTI in a case captioned Uniform Tubes, Inc. v. Fireman's Fund Ins. Co., et al., filed in the Eastern District of Pennsylvania. Defendant Fireman's Fund apparently takes the position that UTI "relinquished all rights to future claims" to the four categories of expenses[11] listed in the agreement, and thus *374 "UTI cannot have incurred any losses, costs or damages after June 16, 1982 for the listed categories," and that UTI's present damages claims are accordingly "barred by the terms of the June 16, 1982 Settlement and Release Agreement." Def.Br. at 35.
The coverage action which was settled by means of the June, 1982 agreement was one in which plaintiff sued Fireman's Fund only under policy number LC-2566937, a CGL policy. Substantively, the complaint alleged that payment was sought under the contract for the following reasons:
8. In September, 1977, it was determined that certain chemicals had leaked from underground storage tanks located on the plaintiff's property and spread to and contaminated water supplies on adjacent properties.
9. Due to the emergency nature of the situation, plaintiff was required to take immediate steps to supply adjacent property owners with water and pay certain damages.
Cmplt., Pl.Ex. 16. As plaintiff points out, the complaint sought damages in the amount of $109,646.67 for costs incurred through September 30, 1978, with interest and costs, as well as additional amounts incurred, but the complaint did not contain a count for declaratory judgment with regard to any future costs. Through the agreement, UTI and Fireman's Fund settled the then existing litigation in exchange for Fireman's Fund payment in the amount of $75,000 under the single policy sued upon.
The Settlement Agreement contained the following express limitation:
BY THIS SETTLEMENT, it is understood and agreed that neither [UTI] not Fireman's Fund Insurance Company waive or release any of their rights, claims or defenses in relation to the said Fireman's Fund policy, nor policy conditions, exclusions or definitions, in any suit, claim, demand or cause of action by a third person for their personal injury or property damage against [UTI].
Id. (emphasis supplied). The court finds, as a matter of law, that the above-described claims are (1) clearly excluded from the scope of the June 16, 1982 settlement agreement by the express terms of that agreement, and (2) precisely the types of claims sued upon in the instant action.[12] Accordingly, defendants' argument that the June 16, 1982 settlement agreement constitutes at least a partial bar to coverage must be rejected. Defendants' motion for summary judgment on this ground will be denied.

F. Defendants' Argument That UTI's "Damages" are Limited Solely to Costs and Expenses Incurred for Corrective Measures Under RCRA Due to TCE Leakage From One or More Underground Storage Tanks and That the "Owned Property" Exclusion Bars Coverage

The policies typically contain a statement in the insuring clause that
The Company will pay on behalf of the insured all sums which the insured becomes legally obligated to pay as damages ...
Def.Br. at 33. Defendants raise a somewhat vague argument that the expenses listed in a certain document produced in discovery not part of the complaint (Verhoog's compilation of UTI's pollution related expenses, see Def. Ex. "S") might not all be covered as "damages" under the policy. Def.Br. at 34. Defendants argue that "[e]xpenses voluntarily incurred or UTI's own expenses do not meet the definition of damages. No legal obligation to a third party is/was satisfied by payment of these monies. These expenses are not reimbursable." Id. The court, however, *375 is not presented with sufficient evidence of the scope of "these monies" or "these expenses" to permit it to rule on the issue, even if it were otherwise inclined to do so in a motion for summary judgment. The "damages" argument is not ripe for summary judgment and will not be the subject of further discussion herein.
In addition, in their reply papers defendants raise, for the first time, the defense of the "owned property" exclusion, contending that the exclusion is contained in the policies sued upon and precludes reimbursement of costs for damages to the insured's own property. Def. Reply Br. at 19. Thus, if no off-site migration has occurred, no claim for reimbursement will be allowed, according to defendants.
Even if the court were inclined to address this late-raised argument, it would be rejected. Defendants have simply failed to meet their threshold burden as summary judgment movants to establish the factual predicate for this argument, by setting forth evidence regarding whether there was off-site migration; if so, to what extent; and whether costs incurred by plaintiff with regard to pollution on its own property were incurred to prevent damages to the property of others. See Consolidated Rail Corp. v. Certain Underwriters at Lloyds, No. 84-2609, 1986 WL 6547 (E.D.Pa. June 5, 1986), aff'd, 853 F.2d 917 (3d Cir.1988) (where expenditures went in part to clean up insured's own property, and where contamination of insured's property posed an imminent risk to the property of others, no bar to coverage) (Pl.Ex. 104). Plaintiffs, on the other hand, have come forward with evidence to show that in 1977 the Pennsylvania Department of Environmental Protection obtained the results of a water sample test performed on water in a neighbor's well; that the results showed the presence of TCE and TCA in the neighbor's well; and that the suspected source of the leak was UTI's facility. UTI Exs. 6, 7 and 69. Accordingly, defendants' motion for summary judgment on the grounds of the owned property exclusion will be denied.

G. Defendants' Argument That Policies Issued After September 1, 1977 Do Not Afford Coverage As a Loss Was Known, In Progress, or, in the Alternative, Any Loss Was Expected by UTI After That Date

Fireman's Fund moves this court to deny coverage under policy XLX-1268771, which it issued to UTI on May 5, 1978. In support of its motion, Fireman's Fund contends that UTI knew or should have known that it would suffer a loss as of September 1, 1977, when Fireman's Fund alleges PaDER confirmed the presence of groundwater contamination from UTI's facility. Invoking the "known loss" doctrine, Fireman's Fund contends that UTI cannot receive insurance coverage for losses that it knew about at the time it obtained the insurance. Specifically, Fireman's Fund contends that because it is uncontested that UTI knew it had leaking TCEs prior to the May 5, 1978 date, coverage under the policy which took effect at that time must be barred, because the resulting "losses" suffered by UTI were already a known certainty.
We must keep in mind, when assessing the "known loss" defense, that it is a defense grounded in policy considerations. This is not a case in which the insurer has alleged fraud on the part of the insured in the application process. Rather, in seeking protection through the "known loss" defense, the insurer asks the court to intervene to insulate it from paying claims on the ground that the risk which came to pass was "uninsurable" at the time the policy of insurance was sold, although the insurer was presumably free to inquire about pollution and other problems of the insured in the course of the application process, and although there is no allegation that the insured was less than forthcoming during the application process.
The "known loss" doctrine has not been tested in the state courts of Pennsylvania, and this defense has been recognized to different extents by the courts of other states.[13] *376 This court, of course, is charged with making a prediction about how the Supreme Court of Pennsylvania would rule on the instant motion. See Hakimoglu v. Trump Taj Mahal Associates, 876 F.Supp. 625 (D.N.J.1994) (citing McKenna v. Ortho Pharmaceutical Corp., 622 F.2d 657, 661 (3d Cir.), cert. denied, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980)). In the view of this court, the Pennsylvania Supreme Court would recognize the "known loss" defense in at least some form if presented with it.[14] The difficult question presented is what precisely has to have been "known" prior to a liability policy's inception date for purposes of precluding coverage under general insurance principles: that there was some injury or damage to property; that there was a risk of injury or damage; or that there was injury or damage which resulted in a loss to the insured covered by the policy.
In this connection, we note that the policy at issue here is an excess liability policy. Plaintiff takes the position that the "known loss" doctrine does not bar coverage for the instant claims because although it was apprised of the fact of a leak from its USTs after a field representative from PaDER cited UTI for a leak at the Collegeville Facility on September 1, 1977, it could not have known that the leaking USTs would result in a loss in the multi-million dollar range. Reply Br. at 71. In other words, although the source of some of the losses ultimately sustained may have been known to the insured prior to May 5, 1978, the financial injury which forms the basis for the instant claim for insurance coverage was not yet known.
This is a critical point because it is all too easy to confuse the principles barring coverage under a first party insurance policy for a loss already in progress at the time the insurance is purchased, see, e.g., Summers v. Harris, 573 F.2d 869 (5th Cir.1978) (flooding of property covered by homeowners insurance policy), with the principles that would operate as a bar to coverage in the third party liability insurance context. In the context of first party insurance policies, once the unfortunate event occurs (like the flood in Summers), there remains no statistical uncertainty of risk to be appropriately insured against. By contrast, however, the occurrence of the event (here, the leak of TCEs) does not destroy the requisite element of statistical uncertainty in the third party liability context, as the relevant events remain to be determined, including: is there any harm to off-site locations; will claims be filed at all; what number of claims will be filed; what sums of money will the claims demand. In other words, plaintiff did not purchase liability insurance to compensate it for all property damage, but rather to compensate it for all sums for which it is held *377 liable as a result of claims in which damage to property of third parties is alleged. The relevant "loss" to plaintiff is not the property damage itself, but rather the company's legal liability arising therefrom. This point is especially salient here, where it is an excess liability policy at issue; even if it were a certainty that legal liability would follow from the known leakage of TCEs by the date the policy was issued, defendants have supplied no proof that, at the time of contracting, there existed certain knowledge of a particular legal liability which would reach the excess layer.
Thus the court in Montrose Chemical Co. v. Admiral Ins. Co., 35 Cal.App.4th 335, 5 Cal.Rptr.2d 358 (2d Dist.1992), rejected the insurer's known loss defense in the coverage dispute before it arising out of environmental pollution:
According to Admiral, Montrose's knowledge of the problems at the Stringfellow site defeats coverage. In this context, Admiral points to the facts recited at the beginning of this opinion, emphasizing Montrose's receipt of the EPA's PRP notice on August 31, 1982. Admiral misses the point. The PRP notice is just what its name suggests  notice that the EPA considered Montrose a "potentially" responsible party. While it may be true that an action to recover clean-up costs was inevitable as of that date, Montrose;s liability in that action was not a certainty. There was still a contingency and the fact that Montrose knew it was more probable than not that it would be sued (successfully or otherwise) is not enough to defeat coverage.
Id., at 356, 5 Cal.Rptr.2d at 378.
We do not have occasion to go so far in the circumstances here presented. In this court's view, the Supreme Court of Pennsylvania would reject the "known loss" defense in the form asserted by defendants here  namely, that because plaintiff was officially on notice of leakage at the site prior to May 5, 1978 (and of the possible contamination of a neighbor's well in 1977), no coverage for damages ultimately incurred by the third-parties as a consequence of TCE leaks may be afforded under the excess liability policy issued on that date. See City of Johnstown v. Bankers Standard Ins. Co., 877 F.2d 1146, 1153 (2d Cir.1989). Accordingly, defendants' motion for summary judgment on policy number XLX-1268771 on the grounds that any pollution-related losses were "known losses" by May 5, 1978 will be denied.
Finally, on the question of the "expected and intended" exclusion, summary judgment is unavailable to defendants. Under Pennsylvania law, the "neither expected nor intended" clause contained in the policies[15] excludes coverage where the injury was the result of intentional conduct. Pennsylvania courts have concluded that the "expected or intended" harm exclusion is ambiguous and, as a result, must be construed against the insurer. Germantown Ins. Co. v. Martin, 407 Pa.Super. 326, 595 A.2d 1172, 1175 (1991); United Servs. Auto Ass'n v. Elitzky, 358 Pa.Super. 362, 517 A.2d 982 (Pa.Super.1986), allocatur denied, 515 Pa. 600, 601, 528 A.2d 957 (1987). The Elitzky court thus held that the terms "expected" and "intended" were to be construed synonymously such that coverage is denied only the insured specifically intended to cause harm. Id. at 987. With the relevant standard so understood, there is no evidence to support the granting of summary judgment on the "expected and intended" defense on the factual record presented. Defendants' motion for summary judgment on this ground will also be denied.

H. Defendants' Argument that Plaintiff is Entitled to Recover, If At All, Only Under One Excess Umbrella Liability Policy Issued By American Insurance Company

Defendants inform the court that several American blanket excess policies sued upon contain the following language:
OTHER INSURANCE
If there is any other insurance inuring to the benefit of the insured, with respect to an occurrence for which insurance is afforded under this policy, the insurance *378 hereunder shall apply as excess of and not contributory with such insurance. Except for the primary policies, if the insured has other insurance with this Company covering a claim also covered by this policy, the insured must elect which policy shall apply and the Company shall be liable under the policy so elected and shall not be liable under any other provision.
Defendants seek summary judgment in the sense that they seek a declaration, as a matter of law, that plaintiff is entitled to recover, if at all, only under one excess umbrella liability policy issued by American Insurance Company. Plaintiff cross-moves for summary judgment on the ground that the "other insurance" clause is an unenforceable "escape clause."
The Third Circuit has interpreted Pennsylvania law in a manner consistent with plaintiff's position. We rely upon the decision rendered in Automobile Underwriters, Inc. v. Fireman's Fund Ins. Co., 874 F.2d 188 (3d Cir.1989). In that case, the court, relying upon decisions of the Pennsylvania Supreme Court and Superior Courts, as well as prior decisions of the Third Circuit, struck an "other insurance" clause contained in a Fireman's Fund policy as an unenforceable "escape" clause. The clause at issue stated:
Anyone else is an insured while using with your permission a covered auto except: (3) Your garage operations customers. However, if a garage operations customer of yours ...
(a) Has no other available insurance (whether primary, excess or contingent), he or she is an insured only up to the compulsory or financial responsibility law limits where the covered auto is principally garaged.
(b) Has other available insurance (whether primary, excess or contingent), less than the compulsory or financial responsibility law limits where the covered auto is principally garaged, he or she is an insured only for the amount by which the compulsory or financial responsibility law limits exceeds the limits of his or her other insurance.
Id. at 189-90. In striking down the clause, the Third Circuit took pains to explain the distinction between a permissible "excess" clause and an impermissible "escape" clause: "An excess clause provides for payment of that portion of the claim that remains unpaid once other coverage is exhausted," while "[a]n escape clause, on the other hand, relieves the insurer from any obligation to its insured if other coverage is available." Id. at 193. This is precisely what the "other insurance" clause at issue seeks to do: If there is other insurance available to cover the claim, the policy will not provide coverage for the claim (or, if it does by virtue of the insured's election of that policy, the other policy will not provide coverage).
That the "other insurance" provision only applies if the other insurance is provided by Fireman's Fund is of no moment for purposes of the present analysis. See id. ("No escape clause exonerates the company from liability in all situations; all such clauses by definition contemplate the possibility that no other insurance policy will provide coverage, but it is only in the event of that contingency that the insurer will be responsible"). Thus, the fact that American Insurance, as a company, will pay under another policy it issued to the insured for a claim, does not mean that the "other insurance" clause contained in each of the individual policies does not "relieve the insurer from any obligation to its insured if other coverage is available." Id. This conclusion is bolstered by the policy considerations underlying the Pennsylvania courts' hostility to escape clauses. As the Third Circuit reiterated in Automobile Underwriters, it is "`unacceptable for an insurance company to provide no coverage under a policy for which it received premiums.'" Id. at 191 (quoting Contrans, Inc. v. Ryder Truck Rental, Inc., 836 F.2d 163, 166 (3d Cir.1987)) (emphasis added).
Here, Fireman's Fund collected premiums for each of the several blanket excess liability policies it issued to plaintiff. Those policies, however, purport to limit their coverage such that Fireman's Fund may only be liable under one such policy for any claim made by the insured. To that extent, it must be considered to contain an escape clause of a type the Third Circuit has consistently held is unacceptable under Pennsylvania law.
*379 The only difficulty the court faces in reaching its conclusion to deny defendants' motion for summary judgment on the "other insurance" issue and to grant plaintiff's cross-motion is that defendants have cited what might appropriately be characterized as conflicting decisions from the Superior Court of Pennsylvania. At best, the cited decisions are not ones which are easily reconciled with Automobile Underwriters. In Bishop v. Washington, 331 Pa.Super. 387, 480 A.2d 1088 (1984), the court was presented with a policy provision which stated:
If Property Damage or Bodily Injury Liability coverage in more than one Nation-wide policy applies to a loss, we will pay only up to the highest limit in any one policy.
Id. at 391, 480 A.2d 1090-91. The court rejected the insured's argument that the clause was unconscionable, finding that, notwithstanding the presence of the "other insurance" clause, the insured secured substantial insurance coverage under the policy.
Bishop, however, was decided well in advance of American Automobile and as such it must be determined that, to the extent it conflicts with the Third Circuit's holding in that case, the Third Circuit has rejected it as inconsistent with the law of Pennsylvania. Another Superior Court decision, however, reaffirms the holding of Bishop and was decided more recently. In that case, Equibank v. State Farm Mutual Automobile Ins. Co., 426 Pa.Super. 354, 626 A.2d 1243 (1993), the court was confronted with similar policy language:
If two or more vehicle liability policies issued by us to you apply to the same accident, the total limits of liability under all such policies shall not exceed that of the policy with the highest limit of liability.
Id. at 360, 626 A.2d at 1246. The court found Bishop dispositive and enforced the provision.
We are governed by two controlling principles here. First, it is the duty of this court, sitting in diversity, to predict how the Supreme Court of Pennsylvania would rule if presented with the instant motions. Second, as a federal district court, we are bound by the pronouncements of the Third Circuit Court of Appeals; in diversity, we follow Third Circuit precedent unless and until there is a change in controlling Pennsylvania law. Here, Equibank operates as the reaffirmation by the Superior Court of Bishop, a decision which was available for consideration by the Third Circuit prior to the time it decided Automobile Underwriters. Equibank is neither controlling (in the sense that it was not decided by the Supreme Court of Pennsylvania), nor can it fairly be characterized as a "change" in the law, as it merely reaffirmed the prior decision of the Superior Court in Bishop.
Accordingly, we conclude that American Automobile continues to govern our decision in this case. Defendants' motion for a ruling that plaintiff is entitled to recover, if at all, only under one excess umbrella liability policy issued by American Insurance Company must be denied. Plaintiff's cross-motion for a declaration, as a matter of law, that the "other insurance" clause found in defendant American's policies is an unenforceable escape clause will be granted.

I. Defendants' Argument that Fireman's Fund Excess Liability Policy No. XL-339343 Has Policy Limits of $1 Million Only

Defendants seek summary judgment on the issue of whether Fireman's Fund excess liability policy number XL-339343 has limits in excess of $1 million. Plaintiff cross-moves for summary judgment, seeking a declaration that the policy, which was in force for a three year period, has a coverage limit of $1 million for the first annual period and $5 million each occurrence for each of the second and third annual periods of the policy.
Defendants appear to concede the point that the $1 million limit referenced in its moving papers is for each of the three annual periods covered by the policy. Def.Reply Br. at 52. Because plaintiff's cross-motion subsumed this issue, and because plaintiff came forward with evidence to *380 support its position, see Pl.Br. at 130,[16] it was incumbent upon defendants to come forward with evidence to the contrary if they wished to oppose that portion of plaintiffs' motion. In any event, plaintiff has met its burden to establish that, at a minimum, the policy provides total coverage limits, over a three year period, of $3 million each occurrence/$3 million aggregate.
The only question remaining is whether a $5 million dollar endorsement plaintiff contends took effect prior to the second year of the policy was "canceled flat." If not, then plaintiffs are entitled to a declaration that the policy limits for each of the second and third years of the policy period are $5 million. Suffice it to say that genuine issues of material fact remain for trial on this question. At deposition, Mr. Phillips, the designated Rule 30(b)(6) witness for Fireman's Fund, was unable to say, "sitting here today," that the $5 million endorsement was "canceled flat." UTI Ex. 79 at 107. In his affidavit, he was able to reach such a conclusion. Def. Ex. G. This is not a case in which there is an unexplained "contradiction" between prior sworn deposition testimony and statements in an after-obtained affidavit of a type which precludes the side offering the affidavit from successfully defeating summary judgment, see Martin v. Merrell Dow Pharmaceuticals, 851 F.2d 703, 706 (3d Cir. 1988), because the question posed at deposition may have depended upon the documentation presented to the deponent for a response. Phillips' affidavit testimony is competent and it thus materially contradicts plaintiff's proffered evidence on this point.
Accordingly, defendant's motion for summary judgment on the issue of whether Fireman's Fund policy number XL-339343 has policy limits of only $1 million will be denied. Plaintiff's cross-motion for summary judgment will be granted insofar as plaintiff seeks a declaration that the policy has limits of at least $1 million occurrence/$1 million aggregate for each of three years; plaintiff's cross-motion will be denied insofar as plaintiff seeks a declaration that the policy provides limits of $5 million each occurrence/$5 million aggregate for each of the second and third years of the policy period.

J. Defendants' Argument That Plaintiff Has Failed to Prove the Existence of Certain "Lost" Policies

Plaintiff alleges that Fireman's Fund policy no. XLB-1065316 with a term of June 7, 1972 to June 7, 1973 with limits of at least one million, and Fireman's Fund policy no. XLB-1069383 with a term of June 7, 1973 to June 7, 1974, provide coverage to it, although plaintiff has been unable to locate copies of the policies themselves. Defendants move for summary judgment on the ground that plaintiff has failed to adequately prove the existence of the policies to recover thereunder. Plaintiff cross-moves for summary judgment, arguing that it has established the existence of the policies by clear and convincing evidence.
The parties do not disagree that, under certain circumstances, an insured may recover under a "lost" policy of insurance. At least if plaintiff can prove by clear and convincing evidence (1) that the document has been lost, and (2) the contents of the lost policy, it may be entitled to a recovery under the policy. See In re Greggerson's Estate, 344 Pa. 498, 25 A.2d 711 (1942) (missing note). Accord, Monsanto Co. v. Aetna Cas. & Sur. Co., 1993 WL 563244, 1993 Del.Super. LEXIS 461 (Del.Super. Dec. 21, 1993) (Missouri law) (lost insurance policy).
Defendants do not contend that plaintiff has failed to show that an adequate search was undertaken, without success, to deem the policies "lost." The question is instead whether plaintiff has uncovered sufficient evidence of the existence of the policies that it may proceed to the jury in an effort to recover under them.
Disregarding the credibility attacks on plaintiff's witnesses advanced by defendants, and making all reasonable factual inferences in favor of plaintiff, as we must on the instant motion by defendants, the *381 following evidence exists to prove the existence and terms of the lost policies.[17] For the year immediately prior to the policy term of the first lost policy (XLB-1065316), Fireman's Fund provided excess liability insurance to UTI by policy no. XL-33943. Pl.Ex. 46. This is the three-year excess policy discussed in part "I" above. On June 5, 1972, two days before policy no. XL-33943 was to expire, Jack Conlow, an account assistant with Alexander & Alexander, wrote to Fireman's Fund requesting that policy no. XL-33943 be bound for renewal. Pl.Ex. 78. On June 8, 1972, Jack Cavanaugh, an underwriter in the Excess and Special Risk Department at Fireman's Fund, responded to the Conlow memo as follows:
Jack 
I'll agree to bind for two weeks from expiration  such binder to terminate 6/21.
John J. Sherman, Jr., the account manager for Alexander & Alexander responsible for the UTI account, testified that Mr. Cavanaugh's reply bound the renewal of expiring policy no. XL-33943 in an amount of $1 million excess of primary. Pl.Ex. 80 at 24-28, 59-61.
Plaintiff then presents circumstantial evidence from which one might infer that the temporary binder was converted into policy no. XLB-1065316 for the period June 7, 1972 to June 7, 1973. On June 21, 1972, the date on which the two-week binder expired, Mr. Conlow again wrote to Fireman's Fund, this time requesting that Fireman's Fund renew policy no. XL-3343 "on annual basis per your quotation of $1520." Pl.Ex. 78 at ¶ 7. There is no evidence that Mr. Conlow's request was withdrawn or that Fireman's Fund declined to write the coverage. Plaintiff notes that Fireman's Fund does not dispute that it wrote the excess liability coverage for UTI for years following the lost policy years. Both the broker and representatives of UTI testified to their recollections that UTI never had a gap in its excess liability coverage. Ex. 78 ¶ 3; Ex. 55 at ¶ 4; Ex. 81 ¶ 3.
This circumstantial evidence is supported by documentation. In a letter dated July 12, 1972, during the term of the first lost policy, Mr. Conlow wrote to Fireman's Fund requesting that an endorsement be issued to amend the name of the insured; that letter expressly referenced policy no. XLB-1065316. Pl.Ex. 78 at ¶ 8. That letter is date stamped by Cavanaugh, evidencing its receipt by the Excess and Special Risks Department. In addition, on July 31, 1972, Mr. Cavanaugh responded to Mr. Conlow's request to amend the named insured; Mr. Sherman testified, upon being shown a copy of that correspondence, that the memorandum refreshed his recollection that policy no. XLB-1065316 existed as of that date. Ex. 80 at 32-33. On August 8, 1972, Mr. Conlow responded to Mr. Cavanaugh's July 31, 1972 memorandum, referencing UTI's policy no. XLB-1065316 in the "re" portion of his letter. That letter was stamped as received by Cavanaugh on August 8, 1972.
On July 8, 1973, one year and one day after the inception of the first lost policy, Mr. Cavanaugh wrote to Mr. Conlow concerning a request to add a new company, Electro-tools, to the first lost policy. Pl.Ex. 78 ¶ 11. Mr. Conlow was advised of "automatic coverage for 30 days" for Electrotools. Id.
Plaintiff has met its burden, as the summary judgment opponent, to show the existence of genuine issues of material fact remaining for trial on the issue of whether policy no. XLB-1065316 was issued. As to its terms, Fireman's Fund produced, pursuant to a discovery order, all standard or specimen forms of excess liability insurance and endorsements used during the 1970s. Plaintiff represents that defendants' production reveals that only one form or endorsement was used during this time period, namely, form no. 5846-9-68. Plaintiff will be permitted to proceed with its proofs and attempt to convince the finder of fact that form no. 5846-9-68 provided the terms and conditions of "lost" policy no. XLB-1065316.
As to the second lost policy, number XLB-1069383 (June 7, 1973  June 7, 1974), plaintiff may similarly proceed to the jury. Fireman's Fund issued to UTI excess liability *382 policy no. XLB-1071748 for the policy period June 7, 1974 to June 7, 1975, accepting the date plaintiff believes the second lost policy expired. The Declarations page of the 1974-75 policy identifies it as a renewal of the second lost policy, Pl.Ex. 49; Mr. Phillips testified to the practice of identifying the policy being renewed in the Declarations page of the renewal policy. Additionally, plaintiff points to the testimony of O. Frank See, formerly a countersigning agent for Alexander & Alexander, who signed the Declarations page, and who confirmed that the indication on the Declarations page of policy no. XLB-1071748 that it was a renewal of policy no. XLB-1069383 means that the second lost policy existed for the immediately preceding policy period. Pl.Ex. 84. Plaintiff also provides the court with additional evidence, in the form of letters and memoranda referencing the second lost policy by number, to bolster its claim that the policy existed. Suffice it to say that plaintiff has produced sufficient evidence of the policy's existence that it may proceed to the jury on the question of the existence of the second lost policy.[18]
In sum, defendants' motion for summary judgment precluding plaintiff from proving the existence of Fireman's Fund excess liability policy number XLB-1065316 with a term of June 7, 1972 to June 7, 1973 and Fireman's Fund policy no. XLB-1069383 with a term of June 7, 1973 to June 7, 1974, will be denied. Plaintiff's cross-motion for summary judgment that it has proven, by clear and convincing evidence, the existence of those policies will also be denied.

K. Defendants' Argument That, As Only One "Occurrence" Has Happened, Coverage Under Defendants' Policies Issued After July 12, 1975 Is Barred

The liability policies at issue are "occurrence" based. That is to say that, as a general proposition, the policies provide coverage for all sums paid as damages arising out of an "occurrence," at various levels (primary, excess, etc.). The policies provide slightly varying definitions of "occurrence," including:
(1) "occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage during the policy period neither expected nor intended from the standpoint of the insured [Fireman's policy number MXP 300-84 64];
(2) ... with respect to Coverage A and B, an event or a continuous or repeated exposure to conditions, which during the policy period, unexpectedly and unintentionally causes personal injury or property damage. All such personal injury or property damage arising out of exposure to substantially the same general condition shall be deemed to arise out of one occurrence. [American's policy no. XLB-1244947]; and
(3) "occurrence" means an accident including continuous or repeated exposure to condition, which results in personal injury or property damage or advertising injury neither expected nor intended from the standpoint of the insured. [American's policy no. XLX-1268771.]
Def.Br. at 34-35. Defendants do not argue that any differences between the various "occurrence" definitions are material. They seek summary judgment, alleging that the *383 facts "clearly show" that: "(1) any alleged leakage of TCE from one or more of the USTs at UTI's Collegeville, Pennsylvania facility gives rise to only one occurrence, not multiple occurrences, and (2) no occurrences are possible under Fireman's or American's primary or excess policies or any policy issued after July 12, 1975 (the date of TCE to TCA changeover) due to any alleged TCE leakage." Br. at 37.
As to the first prong of the instant motion, defendants cite no pertinent authority. The cases cited in support of a single-occurrence theory are inapposite. See Appalachian Ins. Co. v. Liberty Mutual Ins. Co., 676 F.2d 56 (3d Cir.1982) (employment discrimination case); Business Interiors, Inc. v. Aetna Cas. & Sur. Co., 751 F.2d 361 (10th Cir.1984) (check forgeries); North River Ins. Co. v. Huff, 628 F.Supp. 1129 (D.Kan.1985) (fraudulent loan transactions); D'Auria v. Zurich Ins. Co., 352 Pa.Super. 231, 507 A.2d 857 (1986) (medical misdiagnosis).
As to the second prong of the instant motion, defendants have failed to show the absence of genuine issues of material fact remaining for trial. Defendants appear to argue for a ruling that because the TCE was no longer stored in the USTs after July 12, 1975, there could have been no "leak" after that date and that it therefore necessarily follows that there could have been no covered "occurrence." But the language of the policies does not support such a conclusion. The policies do not tell us that it is the toxic leak which, in the pollution context, triggers coverage; the policies tell us only that coverage is triggered by an accident or continuous or repeated exposure to conditions which results in (bodily injury or) "property damage" during the term of the policy. If "property damage" occurred after the date of the last leak of TCE from the USTs, there could conceivably be coverage under the policies.
Thus, plaintiff offers the report of its expert hydrologist, Walter M. Leis, P.G., which supports the view that the USTs began leaking during the period between June, 1966 and February, 1968, and continued to leak until the USTs were pumped dry, filled with concrete, and closed in place in the fall of 1977, and that during and after the leak, the contaminants migrated through the bedrock and the groundwater. Pls. Exs. 33 and 95. If plaintiff were able to convince the finder of fact of this sequence of events at trial, there is no reason for the court to bar coverage under any or all of the post-1975 policies.
This conclusion is amply supported by current case law, although the court has not been presented with any cases from the state courts of Pennsylvania on point. In his recent decision in Chemical Leaman Tank Lines v. Aetna Cas. & Sur. Co., 817 F.Supp. 1136 (D.N.J.1993), Judge Brotman predicted that the New Jersey Supreme Court would apply, as a matter of law, the "continuous trigger" theory of coverage for pollution damage claims. That is, if plaintiffs could make the requisite factual showing, they could recover under each policy in force from the date the insured began operating its rinsewater treatment plant through the date the resulting soil and groundwater contamination damage manifested itself. Id. at 1153-54. The policies would thus be continuously triggered if the insured could show (1) that some kind of property damage occurred during each policy period for which the insured seeks coverage, and (2) that the property damage was part of a continuous and indivisible process of injury. Id.[19]
The Third Circuit, in a case decided under Pennsylvania law, has also recognized the determinative nature of the factual record in deciding whether coverage is provided under a given policy of insurance. In affirming the district court's grant of summary judgment for the insurance company in a case in which the plaintiff sought coverage for pollution-related damage, the court in Armotek Industries *384 v. Employers Ins. of Wausau, 952 F.2d 756, 763 (3d Cir.1991), noted:
Much, if not all of the injury to the property resulting from the 1977 chromic acid spill must have occurred at the time of the spill or at some other point prior to 1979, when the first Wausau policy took effect. Armotek might have attempted to prove that separable injury to property occurred after 1979 as the chromic acid migrated underground, but Armotek's brief does not appear to make such an argument, and it certainly does not identify any factual support for such an argument in the summary record.
Id. at 763.
Plaintiff does not ask us to decide, nor do we decide, whether, as a matter of law, the "continuous trigger" theory operates under the facts here alleged. Rather, we simply decide that defendants' motion for summary judgment seeking a declaration that no occurrences are possible under Fireman's or American's primary or excess policies or any policy issued after July 12, 1975 (the date of TCE to TCA changeover) due to any alleged TCE leakage must be denied.[20] Plaintiff will be afforded an opportunity to create a factual record to convince a trier of fact that property damage from TCE occurred on and after that 1975 date.[21]

L. Defendants' Argument That The EPA RCRA Claims Are Barred Due To Late Notice of That Claim

The policies under which plaintiff sues generally contain provisions requiring the insured provide "notice" of (1) an occurrence, and (2) a suit or claim, "as soon as practicable." See Def.Br. at 14-15 for language contained in various policies. With regard to one of the claims for which plaintiff presently seeks coverage  the RCRA claim which resulted in two administrative consent orders entered into in 1988 and 1992, respectively  defendants rely on a late notice defense. Defendants seek summary judgment on the ground that, as a matter of law, plaintiff failed to comply with the notice provisions in the policies. Plaintiff cross-moves for summary judgment on the ground that it adequately complied with the notice provisions and that, even if it didn't, defendants failed to meet their burden, in opposition to plaintiff's motion, to demonstrate prejudice from any late notice.
The relevant and undisputed facts are as follows. On September 20, 1977, Cornelius Verhoog, Vice President, Finance, UTI, notified John J. Sherman of Alexander & Alexander that the Department of Environmental Resources of the State of Pennsylvania indicated that an inspection detected the inadvertent discharge of TCE and other chemicals from the property. Pl.Ex. 10. Alexander & Alexander passed the information on to Fireman's Fund directly by letter dated December 23, 1977. It wasn't until November 30, 1978 that a letter was sent over the signature of John R. Sandberg at Fireman's Fund to Mr. Verhoog denying coverage. Coverage was denied on the ground that "the loss in question discovered on July 7, 1975 is not covered and did not occur within our policy period which expired February 14, 1977," and under the pollution exclusion. Pl. Ex. 15.
In April, 1981, UTI tendered the water authority action, seeking coverage from Fireman's Fund. Coverage was denied by Mary Butter upon reviewing the complaint in that action. In the meantime, activity at the site was ongoing, and, during the 1980s, the United States Environmental Protection Agency *385 stepped in. The upshot of defendants' argument is that no further notice was provided to them regarding the EPA's intervention until February, 1992, and that, accordingly, plaintiff failed to provide notice of a potential claim "as soon as practicable." It is plaintiff's position that once all coverage for the pollution was denied, their obligations ceased; in any event, EPA merely took over as the lead agency overseeing work at the site about which defendants were originally put on notice.
Applicable Pennsylvania law is clear. In order to successfully defeat coverage by relying upon the notice provision in its contract, the insurer is required to meet its burden to prove "(1) that the notice provision was in fact breached, and (2) that the breach resulted in prejudice to its position." Strickler v. Huffine, 421 Pa.Super. 463, 618 A.2d 430 (1992). This rule was first announced by the Pennsylvania Supreme Court in Brakeman v. Potomac Ins. Co., 472 Pa. 66, 371 A.2d 193 (1977). The court there explained:
Where the insurance company's interests have not been harmed by a late notice, even in the absence of extenuating circumstances to excuse the tardiness, the reason behind the notice condition in the policy is lacking, and it follows neither logic nor fairness to relieve the insurance company of its obligations under the policy in such a situation.
Id. at 75, 371 A.2d at 197.
Thus, in Metal Bank of America, Inc. v. Insurance Co. of North America, 360 Pa.Super. 350, 520 A.2d 493 (1987), where pollution incidents took place during the 1969-72 time frame, and where it was not until 1982, two years after litigation had been filed against the insured relating to that pollution by the EPA, that the insurers were actually notified of the claims, prejudice was found. The court agreed with the trial court's determination, on those facts, that
Metal Bank's late notice to the insurance carrier not only prejudiced the insurance carrier by depriving it of the opportunity to investigate the underlying action, it has also severely prejudiced the insurance carrier's ability to defend the claim brought by the EPA and to defend the present claim being brought for indemnification and expenses. It also cannot be disputed that evidence has been dissipated and disappeared and that the passage of time has resulted in the unavailability of witnesses and the fading of memories.
Id. at 361 n. 4, 520 A.2d at 498-99.
The prejudice prong of the late notice inquiry is dispositive of both the motion and cross-motion.[22] Plaintiff met its initial burden, as the summary judgment cross-movant, to produce evidence of a lack of prejudice to defendants. First, plaintiff produces the deposition testimony of the two claims representatives assigned to the UTI pollution claims over the years. Mary Butter, Fireman's Fund's claims adjuster who responded to UTI's notice in 1977-78 and recommended to her superior, John R. Sandberg over whose signature the original denial of coverage letter went out, testified as follows:
Q: Why would you not have dealt any differently with this claim in 1978 if you knew that the EPA was involved?
A: Because of the exclusions in the policy. If it wasn't covered, it wouldn't matter who was involved.
Q: And the exclusions you are particularly referring to are the manifestation issue?
A: All of the  there are several coverage issues. But the manifestation issue and the pollution exclusion.
Pl.Ex. 13 at 168.
The testimony of Ms. Musante, also a Fireman's Fund claims representative who more recently was assigned to handle the UTI claims, is similar:
Q: Are you aware of any prejudice which Fireman's Fund has suffered as a result of what you contend to be untimely notice of the EPA claim?

*386 A: Not at this time.
Pl.Ex. 24 at 326.
She further testified:
Q: Would your conclusion have been any different if Fireman's Fund had been put on notice of the EPA claim contemporaneous with the beginning of negotiations with the EPA?
A: I don't know.
Q: Do you think that you might have not relied on the manifestation defense if Fireman's Fund were put on notice of the EPA claim contemporaneous with negotiations?
A: I believe Fireman's Fund would have relied on the manifestation.
Q: To disclaim coverage?
A: Yes.
Id. at 324-25.
Through this testimony, plaintiff has met its threshold burden as summary judgment cross-movant to show the absence of genuine issues of fact remaining for trial on the question of prejudice. In addition, plaintiff relies, appropriately, in this court's view, upon the fact that, even today, defendants continue to deny coverage under the policies. Certainly there is evidence to support the conclusion that Fireman's Fund would have taken no additional action with regard to the EPA claim if a supplemental notice had been tendered.
Defendants do nothing, in opposition to the cross-motion, to affirmatively show that they did, indeed, suffer prejudice from plaintiff's failure to provide supplemental notice of EPA-led activities in connection with pollution at the site. They do attempt, through the affidavit of Ms. Musante, to blunt the impact of plaintiff's proof of a lack of prejudice, but they do not come forward with evidence to show that they were in fact harmed by late notice. Because prejudice is an element of defendants' late notice defense upon which they bear the burden of proof at trial, see Brakeman, it was incumbent upon them, in order to defeat plaintiffs' properly supported cross-motion for summary judgment on the notice issue, to come forward with evidence sufficient to show the existence of genuine issues of material fact remaining for trial as to prejudice. See Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This defendants have failed to do, and thus this court will grant plaintiff's cross-motion for summary judgment on the ground that defendants may not rely upon the late notice defense at trial. It follows that defendants' motion for summary judgment on the notice issue will be denied.

M. Defendants' Argument That UTI Has Breached The Cooperation Clauses in the Policies

Defendants next and finally rely upon the cooperation clauses contained in the policies to defeat coverage. They represent that the cooperation clauses appear in the policies substantially as:
The insured shall cooperate with the Company and upon the Company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damage with respect to which insurance is afforded under this policy, and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at its own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of the accident.
Def.Reply Br. at 36.
Defendants fail to clearly articulate precisely how it is that plaintiff breached the cooperation clause, although it appears that defendants' argument is premised upon the notion that plaintiff assumed obligations "voluntarily." Even assuming the factual predicate for such an argument, defendants' position is baseless.
First, defendants fail to cite to Pennsylvania authority which, as a threshold matter, holds the cooperation clause applicable where the insured denied coverage on the claim. It seems dubious that the clause would have applicability under such circumstances. But even assuming, without deciding, that the clause is otherwise applicable to the instant dispute, defendants' motion must be denied *387 because, again, defendants have failed to provide evidence of prejudice.
Plaintiff cites the court to Cameron v. Berger, 336 Pa. 229, 7 A.2d 293 (1938). That case, in which the insurer defended the coverage action on the ground of the failure of its insured to cooperate at trial, involved a cooperation clause which provided:
Insured shall at all times render all cooperation and assistance in his power and shall furnish Company such information, receipts, vouchers, and sworn statements, when and as the same may be required. Insured, whenever requested, shall aid in effecting settlement, securing information and evidence, attendance of witnesses and in prosecuting and defending suits and appeals.
Id. at 231, 7 A.2d at 294. The court, relying upon Conroy v. Commercial Cas. Ins. Co., 292 Pa. 219, 140 A. 905 (1928), held that the clause had been breached in such a manner as to forfeit the insured's rights under the policy, where the insured had disappeared prior to the time of trial in order to avoid arrest. In reaching this result, the court reaffirmed the conclusion reached in Conroy that the insurer had the burden of proving, not merely a breach of the cooperation condition, but also that "the breach was such as to result in `substantial prejudice and injury to its position.'" Id. at 233, 7 A.2d at 295-96.
As was the case with regard to defendants' argument on the late notice defense discussed above, defendants fail to set forth any evidence of prejudice flowing from any alleged breach of the cooperation clauses by plaintiff. On this ground alone, this court must deny defendants' motion for summary judgment on the failure-to-cooperate defense.[23]

Conclusion
For the reasons stated herein, the court rules as follows on plaintiff's motions and defendants' cross-motions. (1) Defendants' motion for summary judgment on statute of limitations grounds will be denied. Plaintiff's cross-motion for summary judgment on the statute of limitations issue will be granted; (2) Defendants' motion for summary judgment on the basis of laches will be denied. Plaintiff's cross-motion for a declaration that laches does not bar the action will be granted; (3) Defendants' motion for summary judgment on the ground of the pollution exclusion will be denied. Plaintiff's cross-motion for summary judgment on the ground that defendants are estopped from arguing that the pollution exclusion limits coverage to pollution incidents that are of short duration will also be denied; (4) Defendants' motion for summary judgment on the ground that the June 16, 1982 settlement agreement constitutes at least a partial bar to coverage will be denied; (5) Defendants' motion for summary judgment on the ground that UTI's "damages" are limited solely to costs and expenses incurred for corrective measures under RCRA due to TCE leakage and on the ground of the "owned property" exclusion will be denied; (6) Defendants' motion for summary judgment on policy number XLX-1268771 on the ground that any pollution-related losses were "known losses" by May 5, 1978 will be denied, and defendants' motion for summary judgment on the ground that the "expected and intended" exclusion bars coverage will also be denied; (7) Defendants' motion for summary judgment seeking a ruling that plaintiff is entitled to recover, if at all, under only one excess umbrella liability policy issued by American Insurance Company will be denied. Plaintiff's cross-motion for a declaration, as a matter of law, that the "other insurance" clause found in defendant American's policies is an unenforceable escape clause will be granted; (8) Defendants' motion for summary judgment on the issue of whether Fireman's Fund policy number XL-339343 has policy limits of only $1 million will be denied. Plaintiff's cross-motion for summary judgment will be granted insofar as plaintiff seeks a declaration that the policy has limits of at least $1 million occurrence/$1 million aggregate for each of three years, but plaintiff's cross-motion will be denied insofar as plaintiff seeks a declaration that the policy provides limits of $5 million each occurrence/$5 million aggregate for each of the second and third years of the *388 policy period; (9) Defendants' motion for summary judgment precluding plaintiff from proving the existence of Fireman's Fund excess liability policy number XLB-1065316 with a term of June 7, 1972 to June 7, 1973 and Fireman's Fund policy no. XLB-1069383 with a term of June 7, 1973 to June 7, 1974, will be denied. Plaintiff's cross-motion for summary judgment that it has proven, by clear and convincing evidence, the existence of those policies will also be denied; (10) Defendants' motion for summary judgment seeking a declaration that no occurrences are possible under Fireman's or American's primary or excess policies or any policy issued after July 12, 1975 due to any alleged TCE leakage will be denied; (11) Defendants' motion for summary judgment on the late notice issue will be denied. Plaintiff's cross-motion for summary judgment on the ground that defendants may not rely upon a late notice defense at trial will be granted; and (12) Defendants' motion for summary judgment on the failure-to-cooperate defense will be denied.
An appropriate Order follows.

ORDER
This matter having come before the court upon the motions, numbered 1, 2 and 3, of defendants for summary judgment; and upon the cross-motion of plaintiff for summary judgment; and this court having considered the submissions and supplemental submissions of the parties and having heard oral argument on September 7, 1994; for the reasons stated in the Opinion of today's date;
IT IS this 28th day of March, 1995 hereby
ORDERED that defendants' motion for summary judgment on statute of limitations grounds is DENIED. Plaintiff's cross-motion for summary judgment on the statute of limitations issue is GRANTED; it is
FURTHER ORDERED that defendants' motion for summary judgment on the basis of laches is DENIED. Plaintiff's cross-motion for a declaration that laches does not bar the action is GRANTED; it is
FURTHER ORDERED that defendants' motion for summary judgment on the ground of the pollution exclusion is DENIED. Plaintiff's cross-motion for summary judgment on the ground that defendants are estopped from arguing that the pollution exclusion limits coverage to pollution incidents that are of short duration is also DENIED; it is
FURTHER ORDERED that defendants' motion for summary judgment on the ground that the June 16, 1982 settlement agreement constitutes at least a partial bar to coverage is DENIED; it is
FURTHER ORDERED that defendants' motion for summary judgment on the ground that UTI's "damages" are limited solely to costs and expenses incurred for corrective measures under RCRA due to TCE leakage and on the ground of the "owned property" exclusion is DENIED; it is
FURTHER ORDERED that defendants' motion for summary judgment on policy number XLX-1268771 on the ground that any pollution-related losses were "known losses" by May 5, 1978 is DENIED, and defendants' motion for summary judgment on the ground that the "expected and intended" exclusion bars coverage is also DENIED; it is
FURTHER ORDERED that defendants' motion for summary judgment seeking a ruling that plaintiff is entitled to recover, if at all, under only one excess umbrella liability policy issued by American Insurance Company is DENIED. Plaintiff's cross-motion for a declaration, as a matter of law, that the "other insurance" clause found in defendant American's policies is an unenforceable escape clause is GRANTED; it is
FURTHER ORDERED that defendants' motion for summary judgment on the issue of whether Fireman's Fund policy number XL-339343 has policy limits of only $1 million is DENIED. Plaintiff's cross-motion for summary judgment is GRANTED insofar as plaintiff seeks a declaration that the policy has limits of at least $1 million occurrence/$1 million aggregate for each of three years; plaintiff's cross-motion is DENIED insofar as plaintiff seeks a declaration that the policy provides limits of $5 million each occurrence/$5 million aggregate for each of the second and third years of the policy period; it is
*389 FURTHER ORDERED that defendants' motion for summary judgment precluding plaintiff from proving the existence of Fireman's Fund excess liability policy number XLB-1065316 with a term of June 7, 1972 to June 7, 1973 and Fireman's Fund policy no. XLB-1069383 with a term of June 7, 1973 to June 7, 1974, is DENIED. Plaintiff's cross-motion for summary judgment that it has proven, by clear and convincing evidence, the existence of those policies is also DENIED; it is
FURTHER ORDERED that defendants' motion for summary judgment seeking a declaration that no occurrences are possible under Fireman's or American's primary or excess policies or any policy issued after July 12, 1975 due to any alleged TCE leakage is DENIED; it is
FURTHER ORDERED that defendants' motion for summary judgment on the late notice issue is DENIED. Plaintiff's cross-motion for summary judgment on the ground that defendants may not rely upon a late notice defense at trial is GRANTED; and it is
FURTHER ORDERED that defendants' motion for summary judgment on the failure-to-cooperate defense is DENIED.
NOTES
[1] Comprehensive general liability coverage.
[2] The policies marked with a "*" are the so-called "lost policies" whose existence is not admitted by defendants.
[3] Briefing on the motion and cross-motion is in excess of 200 pages per side.
[4] The parties have stipulated that Pennsylvania law applies to the instant dispute. See Stipulation and Order dated February 19, 1993, Pl.Ex. 100.
[5] For the first time in its reply brief, defendants appear to advance the additional argument that the bad faith claim must be dismissed for failure to state a claim upon which relief may be granted because prior to July 1, 1990, Pennsylvania statutory and common law did not recognize a cause of action for bad faith. Reply Br. at 26-30. On that date, a statutory cause of action for bad faith became effective. 42 Pa.C.S.A. § 8371. Because there are allegations of conduct after July 1, 1990 upon which plaintiff is proceeding, for example, the April, 1992 denial letter of Ms. Musante, defendants' argument that Count V must be dismissed in its entirety must be rejected. However, this court recognizes that plaintiff may not proceed to recover for bad faith conduct of the defendants to the extent Count V relies upon conduct of defendants which occurred prior to the effective date of the statute, July 1, 1990, as the statute has no retroactive application. See American International Underwriters Corp. v. Zurn Industries, 771 F.Supp. 690, 703 (W.D.Pa.1991).
[6] For the first time in its Reply Memorandum in [Further] Support of its Cross-Motions for Summary Judgment and in Opposition to Defendants' Motions No. 1, No. 2 and No. 3 for Summary Judgment, plaintiff raises the alternative argument that New Jersey law should be applied to the instant coverage dispute. Explaining that the application of Pennsylvania law is premised on a Stipulation made by the parties and approved as an Order of this Court filed February 19, 1993, see Ex. 100, plaintiff argues that the Stipulation should not be enforced and the Order should be reconsidered on public policy grounds. The court will not address this late-raised argument; although defendants have filed multiple briefs in the instant round of motion practice (briefs in support of their motions for summary judgment numbered 1, 2 and 3, brief in opposition to cross-motion and in further support of the motions), defendant has not had the opportunity to address this argument, as it was advanced in the last-filed brief. The court will not entertain any additional briefing on the instant motions, and will simply disregard plaintiff's late-made argument for application of New Jersey law contrary to the parties' Consent Order.
[7] The parties appear to agree that the relevant language, or similar language, is contained in the following excess policies:

XLB-1242425, covering 6/7/75-5/7/76;
XLB-1244947, covering 5/7/76-5/7/77;
XLX-1267851, covering 5/6/77-5/6/78; and
XLX-1268771, covering 5/6/78-5/6/79.

[8] The insurance bureau-drafted standard 1973 CGL form contained certain changes from the previously-used 1966 CGL form. Among the changes was the addition of the so-called pollution exclusion. Sherman Dec. at ¶¶ 2-3.
[9] The "absolute" exclusion does not contain the "sudden and accidental" exception language that the previously-introduced exclusion contained.
[10] In light of this holding, the court need not decide, for purposes of determining the instant cross-motions for summary judgment, whether plaintiff may support its estoppel defense at trial by presenting evidence that Alexander & Alexander's representations to UTI concerning the meaning of the pollution exclusion were "consistent" with representations made by the insurance industry in general, and by Fireman's Fund in particular, to state regulatory agencies and others.
[11] The four categories of expenses listed in the agreement are:

1. To correct well contamination of immediate neighbors, including the supply or drinking water, city water hook-up, set up or air stripping tower and reimbursement for "damages" incurred;
2. To satisfy expenses and costs incurred by the Joint Water Works when they shut down their well No. 8, when they accelerated completion of well No. 9, when they improved the output of well No. 5, and when they built well No. 10; and
3. To satisfy and pay the expenses and charges of Roy F. Weston [UTI's expert]; and
4. The internal expenses and costs allocations of Uniform Tubes, Inc. with respect to those items which have been the subject of this settlement and to the extent those items of expense, cost or damage were to contractors, Uniform Tubes, Inc. releases, discharges and will hold harmless Fireman's Fund Insurance Company from any further liability, suit, cause of action, claim or demand under its policy for those past or future expenses or costs of such contractors.
[12] Moreover, the court concludes, as a matter of law, that the June 16, 1992 settlement agreement has no impact upon any policies issued by Fireman's Fund to UTI except for policy number LC-2566937.
[13] In Appalachian Ins. Co. v. Liberty Mutual Ins. Co., 676 F.2d 56 (3d Cir.1982), the Third Circuit reviewed the grant of summary judgment by the district court in favor of the insurer under Massachusetts law. The Third Circuit cited case law from a host of federal districts, stated that it need not review the choice of law question, and noted that the principles it applied on appeal were not limited to Massachusetts law. The underlying claims related to alleged discriminatory practices by the insured. Those practices took place in 1965, but charges were not filed until 1971. The insured sued its insurer under policies issued between 1971 and 1974. In the view of the court, the relevant "occurrence" took place in 1965, when the insured adopted its allegedly discriminatory policies. In reaching this conclusion, the court noted: "A contrary result in this case would contravene the rule that an insured cannot insure against something which has already begun ... The rule is based upon the realization that the purpose of insurance is to protect against unknown risks. When the Appalachian policy became effective, however, the risk of liability was no longer unknown because injuries resulted immediately upon Liberty's promulgation of its discriminatory practices." Id. at 63.

We also note that at least two unreported federal district court decisions acknowledge the availability of a known loss defense to coverage in at least its most basic form. See Rhone-Poulenc Rorer, Inc. v. Home Indemnity Co., 1993 WL 345156 (E.D.Pa. Aug. 4, 1993) (recognizing that insured's knowledge of a loss precludes coverage, but denying defendants' summary judgment motion because defendants had failed to show that risk of the underlying claims were a known loss at the inception of the policies); Elf Atochem North America, Inc. v. Pacific Employers Ins. Co., 1992 WL 332239 (E.D.Pa. Nov. 5, 1992) (question of fact exists regarding whether plaintiff knew of the injury before the policy period began).
[14] For example, in a case like Bartholomew v. Appalachian Ins. Co., 655 F.2d 27 (1st Cir.1981), in which the lawsuit for which the insured sought coverage was actually filed prior to the inception date of the insurance policy at issue, there are good reasons for courts to consider whether coverage is barred on the ground that the risk of "loss" to the insured was a virtual certainty by the time insurance was purchased.
[15] Defendants do not specify which policies contain the "expected and intended" language, nor do they set forth the precise language of the exclusionary clause relied upon.
[16] The specific evidence includes the deposition testimony of Jack W. Phillips, Fireman's Fund's Rule 30(b)(6) designee.
[17] We do not treat plaintiff's cross-motion for summary judgment on the lost policy issue in the text. It is clear that the cross-motion must be denied, as plaintiff bears the burden to prove the existence and contents of the policies by clear and convincing evidence.
[18] As to the limits of coverage of the second lost policy, plaintiff produces the following evidence in support of its position that the policy contained limits of $2 million. On April 27, 1973, less than two months before the expiration of the first lost policy, Mr. Phillips wrote to Mr. Conlow advising that an excess liability policy issued to UTI would expire on June 7, 1973 and inquired about the renewal of the first lost policy. Pl.Ex. 78 at ¶ 13. Mr. Phillips testified that the typed portion of the memorandum referenced an excess policy that expired on June 7, 1973. Pl.Ex. 79. The reference to "SUPERCOVER" is a tradename for Fireman's Fund excess liability coverage. Id.

Mr. Conlow responded to Mr. Phillips' memorandum by writing on the bottom portion of the memorandum, requesting quotes for $2 million and $4 million liability limits. Ex. 78 at ¶ 13. That document is date stamped with the Cavanaugh stamp, evidencing receipt. After being shown this document, Mr. Sherman testified that it refreshed his recollection that UTI's excess liability coverage was increased from $1 million to either $2 million or $4 million for the policy period immediately following the term of the first lost policy.
[19] Plaintiff points the court to the recent decision of the Pennsylvania Supreme Court in J.H. France Refractories Co. v. Allstate Ins. Co., 534 Pa. 29, 626 A.2d 502 (1993), in which the court adopted the continuous trigger theory in the context of claims for bodily injury for asbestos-related diseases. Although the result we reach is not inconsistent with that decision, we do not rely upon that decision in denying defendants' motion for summary judgment, as we recognize that the factual record developed in the asbestos disease context is quite distinct from the record we anticipate will be developed here.
[20] To the extent Fireman's Fund presents the argument in its reply brief that the court should apply a "first discovery trigger," the court will disregard the argument. First, it is inappropriately raised for the first time in the reply brief. Second, it is inconsistent with the summary judgment originally sought and briefed in defendants' initial brief, insofar as Fireman's Fund appeared to concede the possibility of coverage under the pre-1975 policies in that brief. Def. Br. at 30-37. In any event, nothing in defendants' reply brief convinces the court to do anything other than to permit the presentation of evidence regarding the dates property damage occurred to the jury for its consideration.
[21] This factual record may include the presentation of evidence regarding earlier representations of Fireman's Fund that it was a "manifestation" carrier when it denied coverage under its policies, a position apparently abandoned by virtue of Fireman's Fund's position on the present motion.
[22] We therefore need not determine whether notice of a claim was, in fact, given later than was required under the policies.
[23] See discussion in Part L, supra.